RUTH JOHNSON, Appellee, v. OVERLAND TRANSPORTATION COMPANY et al., Appellants.

No. 44904.

488

NOVEMBER 21, 1939.

REHEARING DENIED MARCH 9, 1940.

D. M. Kelleher and Horace J. Melton, for appellee.

C. A. Smedal, Maher & Mullen, and Putnam, Putnam, Fillmore & Putnam, for appellants.

BLISS, J.—The collision in which the injuries of plaintiff were received occurred on the south slope of a hill, on primary highway number 71, an arterial paved road crossing the state, at a place, near the south line of Cass county, about a mile and a half north of the town of Grant, at about 10 o'clock Christmas Eve, 1937. The vehicle of the defendants was a combination tractor and trailer. The tractor part in which was the motor, cab, fuel tanks, etc. was about 10 feet long. The trailer was a four compartment tank, about 22 feet long, carrying 3,000 gallons of kerosene, or petroleum distillate. The combination, from bumper to bumper, was about 33 feet in length, and weighed about 14,500 pounds, when empty, and on this occasion carried a load of approximately 20,000 pounds. The top of the tank was about 7 feet from the ground and was about 8 feet wide. Its color was a dirty gray, very like that of the pavement. The outfit had left Augusta, Kansas, that morning, with two drivers, Scott and Herbst. The former had driven to Maryville, Missouri, arriving about 6 o'clock in the evening, and Herbst drove from then on to the time of the collision. The road had become icy and traveling was difficult. They passed through Grant about 9:30 p. m., and reached the place of collision a short time thereafter. The hill in question was about a half mile long, with a rather gentle slope most of the way, and a sharper incline near the top. The hill was icy, and the driver was having difficulty in making the car climb the hill. After shifting to the lowest gear, the wheels lost traction, and the truck stalled when about two thirds of the way up the hill. The tractor and the tank trailer immediately "jack-knifed" into an angle somewhat larger than a right angle, with the tractor facing north on the east lane of the road, and the trailer extending diagonally

southwest completely across the west lane and on to the west shoulder.

The plaintiff. and her husband and their 4½-year-old son left their home near Harcourt, about six o'clock that afternoon, in the Ford car of the husband, for a Christmas visit with her parents, residing near Grant. They came on to highway number 7 at Panora and continued on that road to Hamlin, and turned south on highway 71. The road was hilly and icy all of the way, and the husband, who was a careful, cautious driver, drove at an average speed of about 25 miles an hour. Both of them were quite familiar with the road north of Grant. The husband was driving and in complete charge and control of the car, and the plaintiff sat in the front seat by his side, with the boy asleep in the back seat. There were a succession of hills north of the one on which the defendant's vehicle was stopped, and as they approached this hill from the north, the plaintiff and her husband observed the rays from headlights reflected from the sleet-covered treetops to the south of them. They assumed the light was from an automobile approaching them. They proceeded up the north slope of the hill and over the crest, at a speed, according to Mr. and Mrs. Johnson, of not to exceed 20 miles an hour. Both of them were experienced drivers. As they went over the top of the hill, their attention was directed to the east side of the road, by the headlights of a car apparently parked or stopped near the east shoulder of the road, a few hundred feet down the hill. They assumed that it was a car occupying only the east lane of paving. Near the top of the hill on the west side of the road was the Fisher farmhouse, in front of which was a telephone pole. Farther down on the west side, and about west of the defendant's truck was the Woolenhouse home, in front of which was another telephone pole. Between the two houses, and between the other two poles, was another telephone pole. Neither the plaintiff nor her husband saw any lights except the two headlights. Both testified that the car was going down the hill at not to exceed 20 miles an hour. When they were at a distance 50 feet, and not to exceed 100 feet, from the truck, her husband cried "Look", and as she looked, she screamed, as she saw "this great object that was just the color of the pavement ahead of us." As her husband called her attention to the trailer, he at once threw his weight on the foot

brake, and the speed of the car slackened some, as they testified, but continued straight ahead and struck and went under the tank at about its center. Plaintiff was thrown into the windshield and shattered it with the blow of her face and head. Plaintiff admitted that she was not a very good judge of distance, but estimated that their car was about the distance between two telephone poles (which she imagined was about 100 feet) away from the trailer when she first saw it. There was about a 4 or 5 foot shoulder on the west side, with a rather abrupt ditch beyond. One of the rear wheels of the trailer was in the concrete gutter or flange of the pavement, and the other was on the shoulder. The tank extended beyond the wheels about 2 feet on the shoulder. Passage on the west end of the trailer was completely blocked. The shoulder on the east side was wider and the slope was more gentle. Herbst, the driver, testifying for the plaintiff, said that the Johnson car "couldn't get out of the way".

Plaintiff in her petition, as amended, alleged that the defendants were negligent in the following particulars:

"1. The said defendants, their servants, agents and employees were negligent in that notwithstanding said truck at a time more than one-half hour after sunset was caused and permitted to stop upon, and be stopped upon and remain stationary upon, the paved portion of said highway number 71, defendants did not immediately or at any time place or display a flare, lantern or lighted fusee on the roadway at the traffic side or sides of such vehicle or place and remain in position any flare, fusee or lantern during the time said motor vehicle remained stopped or stationary upon said paved highway aforesaid as is required by Section 472 of Chapter 134 of the laws of the 47th General Assembly."

"2. The said defendants, their servants, agents and employees were negligent in that they were engaged in the operation upon the highways of the State of Iowa of a motor truck within the purview of the provisions of Chapter 134 of the laws of the 47th General Assembly without having lighted or displayed thereon any reflective signals or clearance lamps or marker lamps on the sides thereof and without additional reflectors at or near the front thereof, all in violation of Sec-

tions 409 and 417 of Chapter 134 of the laws of the 47th General Assembly.''

The defendants answered admitting the collision, denied generally, and averred that any injuries received by plaintiff were caused or contributed to by her own negligence, and not by any negligence of the defendants.

In their motion for a directed verdict, the defendants among other grounds, urged that: plaintiff had wholly failed to make a case; the collision occurred because of the negligence of the plaintiff's driver in failing to have his car under control, or to drive at a careful rate of speed, or to keep a proper lookout, or to so operate his car as to stop it within the assured clear distance ahead, all of which negligence was the sole and proximate cause of the collision; plaintiff had failed to show that defendants were negligent, or if they were negligent, that it was the proximate cause of the collision; the failure of the defendants to observe the statutory requirements of setting out flares, fusees, or lanterns, did not constitute negligence because of legal excuse; and plaintiff had failed to show herself free from contributory negligence.

The motion was overruled, and after verdict and judgment for plaintiff, defendants' motion for new trial and exceptions to instructions were also overruled. The overruling of the motions, and the refusal of the court, to sustain the various grounds alleged therein, are assigned as errors for reversal.

I. With respect to plaintiff's allegation that defendants were negligent in not setting out the flares, lighted fusees, or lanterns, as required by section 472 of chapter 134 of the laws of the Forty-seventh General Assembly, the defendants concede that none of these warnings were set out or displayed, but urge that the failure was not actionable negligence, because the circumstances legally excused the failure, and further, because such failure had no proximate causal connection with the injury. They also urged that they substantially complied with the statutory requirements by waving a flashlight toward the Johnson car.

To determine the soundness of defendant's contention, we must go to the facts which have support in the record. Herbst was driving when the truck stalled. Scott, the reserve driver, was then asleep in the compartment, back of and above the seat.

Woolenhouse, as a witness for defendants, testified that, from his house about 80 or 100 feet west, he observed the truck come up the hill, and that the driver "shifted onto low gear, the way it sounded to me, and as he shifted she stopped and she jack-knifed right at that second." Herbst, the driver, testifying for the plaintiff, said that the wheels lost traction on the icy road, causing the vehicle to stop and slide backward until it jack-knifed as described herein. He spent some time trying to right the vehicle and go forward, by spinning the wheels so as to burn away the ice down to the pavement, but on doing this the vehicle would go forward, and upon again getting on the ice would slide back. He then awakened Scott, who took the wheel and tried the same tactics without success, and Herbst then put a block under the wheel. Herbst testified that from the time the vehicle stalled until the collision was 5 or 10 minutes. Scott, who was defendants' witness, and who was asleep when the truck stopped, on being asked "Do you have some judgment, Mr. Scott, please, as to the length of time that elapsed from your becoming aware that the unit had stopped and was slipping until you got out?" He answered "Oh, not over three to five minutes." Woolenhouse, whose testimony, in general, was not convincing, estimated the elapsed time as 3 minutes from the stalling of the truck until the Johnson car came over the hill, which was approximately 500 feet distant. He did not see the car come over the hill, but first observed it 20 feet before the collision, and while he saw it for only 2 seconds before the impact, he testified that it was traveling 30 miles an hour, that Johnson put his brakes on, and the car was sliding, and was traveling "very much faster than it was going 20 feet away before it hit the truck." He and his wife also testified that all of the lights of the outfit were on, contrary to the testimony of the driver of the car. On cross-examination, he reduced the elapsed time, as the following examination shows:

"Q. Now you mentioned a lapse of three minutes between the stalling of the truck and something else that you said happened, do you recall that? A. No, I can't.

"Q. You don't remember now any lapse of more than just these two seconds from the time you first saw it until the accident was all over? A. Well, no.

"Q. Everything that you saw about the accident and the truck and the two cars happened in this interval of two seconds? A. Just a few seconds, it seemed like it was the snap of your finger about.

"Q. Just about as long as to do that (snapping finger)? A. Yes, it seemed like it."

Neither Scott nor Herbst, at any time, made any attempt to comply with the statutory requirement of giving warning. The truck carried all of the necessary equipment—flares, fusees, and red electric lanterns—for complying with the statute. Since the load was a flammable one, the statute required the use of the red electric lanterns, instead of lighted flares or fusees. Some claim is made by the defendants that this equipment was not available because it was in a compartment under the cushion on the driver's seat, and that it was necessary that he operate the tractor to hold the outfit on the road. The position of the trailer, crosswise of the road, with the rear wheels in the gutter of the pavement and against the shoulder, would seem to answer this contention, but such answer is not needed, as the following examination of the witness, Scott, clearly discloses:

"The red lanterns were under the seat on the driver's side. I couldn't get them by reaching them. I would have had to gone around the truck on the other side to get them. They were nearer Herbst. Herbst was right over them.

"Q. Sitting on top of them? A. Yes.

"Q. No way to get at them except to disassemble the seat? A. Just lift the seat cushion up.

"Q. Did you ask Herbst to do that? A. No."

*The truck was standing perfectly still.*

"Q. *Both you and Herbst later got out of it and it didn't move, did it?* A. *Those air brakes on the trailer that you set with the motor running on the steering column will hold any place.*

"Q. *Well, they would hold it in its place without anybody sitting on the cushion, wouldn't they?* A. *Yes.*

"Q. You didn't ask Herbst nor did Herbst offer to help you get the red lanterns or fusees? A. No.

"Q. Nothing said about that? A. No."

It would have taken but a short time to have placed a red

lantern on the traffic side, as the statute requires, which would have been in the line of the plaintiff's and her husband's vision, and might have afforded them sufficient warning of danger in the west lane. The approach from the north was the dangerous one, and a warning lantern, at or near the crest of the hill, would have enabled them to take more effective steps for their protection. Whether the conditions were such as to excuse compliance with the statute, or whether there was sufficient time, or whether such compliance would have given effective notice to the Johnsons were all questions of fact, sufficiently supported by evidence, warranting their submission to the jury. This was also true of the attempt of Herbst and Scott to give warning with flashlights. They were not red flashlights, but the ordinary kind, and they were waved inside the cab, behind the windshield, or just outside, and back of the rays of the headlights. Whether they could be seen by the Johnsons, or whether they afforded a warning of the presence of the trailer blocking their passage, were questions for the jury. The plaintiff and her husband testified that they did not see the flashlights, until they were about 15 or 20 feet away when they observed the flickering of the flashlights about the cab. While there was testimony of the defendants conflicting with that of the plaintiff on this issue, there was ample evidence to support the submission of this allegation of negligence to the jury.

II. Plaintiff's other allegation of negligence, submitted to the jury, was the alleged failure of the defendants to comply with sections 409 and 417, of chapter 134, of the laws of the Forty-seventh General Assembly, which provide that every motor truck, of the type of the defendants, shall have two clearance lamps at each side in front of the truck or trailer, and also at the rear, and also two side marker lamps at the front and rear on each side of the truck or trailer.

The lighting arrangement on the motor unit of the combination was separate from the lighting on the trailer, although each unit was operated by separate switches on the dashboard.

The lights in each circuit were either all on or all off, depending upon how the switch on that circuit was turned. The defendant, Bowles, so testified, and further said that it was not possible to turn on a part of the lights on the trailer without turning them all on. This is important in view of

Herbst's testimony. With reference to the time of the collision, he testified:

"Q. And so far as you know they [the tail lights] were burning at the time? A. *No, I wouldn't say they were.*

"Q. *Do you say they weren't?* A. *I said they weren't.*

"Q. *Do you say they were not?* A. *I say they were not.*

"Q. *When was the last time you knew they were burning?* A. *Because the minute we jack-knifed I noticed the lights were out.*

"Q. When was the 1st time you knew they were burning. A. I wouldn't say, I would say shortly before the accident?

"Q. Did you stop at Grant? A. No, we didn't.

"Q. When was the 1st time you stopped? A. At Maryville. They were burning there."

If the tail lights were not burning, then, necessarily the clearance lights on the front and rear of the trailer, and the marker lights on the left or west side of the trailer, which was the side facing the Johnsons, could not have been burning. Herbst's testimony confirms this. On being asked "whether there were other lights that shone to the north except the tractor lights on the front of the cab," he answered, "I don't think there was." He was plaintiff's witness, but Scott testifying for defendants, said:

"I did not go all around the truck before the other car struck. I was not on the left side at all. I never even saw the right side of the trailer.

"Q. So without seeing either the right or left side, your idea of whether the lights were burning or not is all imaginary, isn't it? A. I didn't say there was any lights burning on that trailer before the wreck.

"Q. You didn't see any? A. No."

Three disinterested residents of Grant saw the defendants' outfit pass through Grant. They were at the Conoco service station on highway 71. One of them, Leslie Embree, a man 37 years old, heard the tractor laboring with difficulty to ascend the hill coming into Grant. He and two others, thinking that the tractor would not make the grade, went outside to watch. All of them were middle-aged men, and all were witnesses for plaintiff. Their testimony was not negative. The truck passed

by at a speed of 5 or 10 miles an hour. They were intent in observing the combination and its operation, and each of them testified that neither the cab nor the trailer had clearance or marker lights on the left or west side; that there were no lights except the headlights; that there were no taillights burning; that they were standing on the west side of the highway. All of them went out to the scene of the collision shortly afterward, and testified as to the position of the combination, as herein stated, and also that the clearance, marker and taillights were not then burning.

No witness disputes any of this testimony, as to lighting, excepting Woolenhouse and wife. The former testified: "The lights on the truck were all lit, the side lights, front lights, tractor lights, cab lights, tail lights and everything was lit, and the clearance lights on the trailer were all lit and I saw them all lit before the accident." He further offered the conclusion, that "after the accident all lights were lit on the truck and trailer except the back light and the side lights *where he hit them. He must have cut them loose.* After the trailer jack-knifed and before the collision all the lights were still lit, everyone of them." But Scott, who claimed to have found a broken wire under the catwalk of the tank, and spliced it after the collision, testified that he found no dents, or marks of a blow at this point.

Mrs. Woolenhouse testified:

"The truck was lighted all over, I could see a lot of red lights, the head lights and the lights on the top, little round red lights."

The plaintiff and her husband each testified that there were no lights burning on the trailer, either before or after the collision. The plaintiff, on cross-examination, testified:

"I couldn't see the tank at the second telephone pole. I couldn't see that tank until we were about fifty feet from it, *because there were no warning signs there and it was just the color of the pavement, it looked just like the pavement.*"

Scott testified that he had flagged down the driver of a car approaching from the south, and then had come back and waved his 8-inch, 500-foot beam flashlight at the approaching Johnson car. But Herbst testified:

"I will say he never left the cab from the time I started burning the road until the accident."

Under this record there is no reasonable basis for saying "that the plaintiff has wholly failed to make a case or produce that quantum of proof as would warrant the court to submit the allegation of negligence to the jury." The evidence justifies not only the submission of the issue of negligence in breaching the statutory sections 409 and 417, and whether such negligence had proximate causal connection with the injury, but, also the verdict of the jury.

 III. The issue of the plaintiff's alleged contributory negligence was properly submitted to the jury. Under the record made, negligence, if any, of her driver could not be imputed to her. In traveling the short distance from the top of the hill to the trailer, the time for any protective action on her part was very limited. Her attention, as was that of her husband, was quite naturally diverted to the tractor on its proper side of the road. There was no reasonably apparent cause to suspect that the trailer blocked the west lane. The jury could find that their car was proceeding at less than 20 miles an hour, and that the eyes of both were focused ahead. Just what she failed to do, that contributed to the collision, or what she reasonably could have done, as an ordinarily prudent person, to avoid the collision, is not apparent under the circumstances. There is no warrant for saying that she was contributorily negligent, as a matter of law.

 IV. Was the negligence of Mr. Johnson the sole proximate cause of the collision? Appellants urge that he was negligent in putting on the brakes so hard that the wheels slid and increased the speed of the car, and he lost control thereof. Whether the speed increased was a disputed question of fact. There is no evidence that the car went out of control, other than that the wheels would not hold on the ice, and went straight forward against the tank. Possibly a different method of braking would have been more effective, but there is no evidence that it would have avoided the collision. But if it be conceded that he was negligent, it cannot be said, as a matter of law, that such negligence was the sole proximate cause of the injury. At the most it was negligence concurring with

the negligence of the defendants, and would not defeat plaintiff's right of recovery. This issue was also for the jury.

Both sides have cited numerous authorities, but the legal principles involved have been so often announced by this court, and are so well understood by the profession, that citations thereof or quotations therefrom would serve no good purpose.

We have no hesitation in saying that we find no errors in the record. The judgment is therefore affirmed.—Affirmed.

OLIVER, C. J., and HALE, SAGER, HAMILTON, MITCHELL, MILLER, STIGER, and RICHARDS, JJ., concur.